Oneal vs. The State of Georgia.

---

THOMAS ONEAL, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

1. It is not error in the Court to call for trial, at a special term for the trial of criminal cases, a case which was continued at the preceding regular term; nor is it error to try it at such special term in the absence of any showing for a continuance on the part of the defense.

2. A juror who married the widow of the prosecutor's uncle is not, on that account, an incompetent juror.

3. Newly discovered evidence, to warrant the granting of a new trial, must be such as would probably have produced a different verdict had it been introduced on the trial; and where it was communicated to defendant's counsel before the argument had closed, who declined then to introduce it, and, assuming it to be true, a want of diligence is shown, a new trial will not be granted on this ground.

4. Where the evidence does not warrant a charge as to reasonable fears the failure of the Court to charge upon that subject is not error.

5. The verdict in this case is not contrary to the charge, the evidence, nor the weight of evidence, neither is it without evidence to support it.

Criminal law. Special terms. Juror. Newly discovered evidence. Charge. Before Judge HOPKINS. Clayton Superior Court. December Term, 1871.

Thomas Oneal was placed on trial for the murder of Joseph M. Anthony. The defendant pleaded not guilty.

The case was called at a special term held for the trial of criminal cases. The defendant objected to the trial on the ground that said cause was regularly called and continued at the September term of said Court next preceding said special session, and was therefore not in order for trial. The objection was overruled and defendant excepted.

The following evidence was introduced for the State.

J. McCONNELL, sworn: "I knew Joseph M. Anthony who was killed ; it was last year, Christmas eve night, on December 24th, 1870; I saw defendant that night; I had been helping in McConnell & Elliott's ; he came into the grocery ; he walked back to the fire to warm, and Rufus Oneal came walking out of the bar-room ; Anthony was standing a little in front of him ; I heard some few short words; I do not know what they said; it appeared there was a little difficulty between them; Rufus Oneal run his hand in his pocket; Anthony asked him if he was going to draw his knife ; Rufus is the brother of defendant, I believe; I did not see a knife drawn, nor weapon of any kind ; Anthony put his hand on Rufus Oneal's shoulder and said, 'my friend I am not mad

Oneal *vs.* The State of Georgia.

with you;' they stepped back two or three steps from where I was; I told them they must have no fuss; defendant was behind Rufus and stepped round to the right and shot Anthony in the right temple; at the time Rufus and Anthony were talking, he was about six feet from the fire; they were facing each other; Anthony's back was to the fire; I think he had on a black cloth coat; Rufus Oneal was just in front of deceased; I was at the fire place rather to the right of them; I was right at them—not more than six steps off; defendant was a little off to the right—behind his brother—not more than a step or two. At the time of the shooting, they were to the south—towards the door—about three steps; defendant jumped around to the right and shot deceased in the right temple; I never saw deceased strike a lick; they appeared in sort of a scuffle backing; the ball hit him in the temple; he fell like a beef; he had no weapons on him, or stick, that I saw; deceased said, 'my friend, I am not mad with you, don't draw your knife on me;' I never saw a knife drawn; I suppose the room is about sixteen feet by eighteen or twenty feet; the expression made by deceased was loud enough to be heard; others were standing by, and could have heard it; deceased had been in only a little while; the Oneals had been there pretty much all day long; I was keeping bar then; nothing was said to deceased when he came in, that I recollect; I have testified to all I heard between them; I do not know why Rufus Oneal attempted to draw his knife; I heard no quarrelling; they never spoke to each other; defendant was right close to him when he fired at him—rather too far off for powder to burn; the pistol was about a medium size Colt's pistol; defendant was four feet off; when he fired he stepped to the right. After firing the pistol they (Rufus and defendant) both broke and ran; my brother caught defendant, I think; Hightower caught Rufus; defendant was caught right in the centre of the house; my brother jumped over the counter and caught defendant in the middle of the room; my brother turned the weapon over to the officer; he took it away from defendant; all

this occurred in McConnell & Elliott's grocery, Clayton county, State of Georgia."

*Cross-examined:* "I had been in the house all day; I do not know how many were present; there were several, I guess there were a dozen or very near it; I don't think they were all in that room; they were passing backwards and forwards, I think; Mr. Mann was there, and Wiley Steward; Thomas Tucker was there; he was drinking and playing billiards; Geo. Mansfield was in there; I never saw him until after dark; he may have been a little drinking; they were drinking right smart; I don't think deceased was drinking much; he had not been in long. I had seen them (defendant and his brother) often in and out; I was in front of the fire; deceased was a little to the right of me; Rufus was in front of deceased, a little to my right; he came in from the bar-room; I turned round; there looked like there was a little jawing; I told them to have no fuss; the door is south; the counter was rather east; the fire place was in the west; I could not hear what was said at first; it looked like there was going to be a difficulty; I told them not to have a difficulty in the house; deceased put his hand on R. Oneal's shoulder, and said, "my friend, don't draw your knife on me;" Rufus' face was towards me; deceased was a little to my right; he was nearer to me than Oneal; deceased was facing Rufus Oneal. I was sworn on the committing trial in this case; I think I swore about same as I do now; I don't think I said the words, "slap on his shoulder;" my evidence was taken down; I believe it was read over to me at the time; deceased had his hand on Rufus' shoulder; the party rather went south; Rufus gave back, and seemed as though he was going to draw his knife; he stepped back soon as I told them they must have no fuss; then I saw defendant jump round; he came right behind Rufus. I do not recollect whether defendant was in at the start or not; I saw defendant jump round, and saw him shoot deceased; I tried to stop it; I do not know positively the time defendant came in, whether with Rufus or not; defendant was right behind Rufus Oneal; I was next to the fire when it com-

Oneal *vs.* The State of Georgia.

menced; they sort of backed a few steps; defendant never spoke to deceased at all; deceased had not his hands on Rufus' shoulder at the time defendant shot; deceased was sort of following, and Rufus was backing sort of; I saw no other scuffle at all but that; I never noticed those that stood by the fire. It was very still times for Christmas eve; there had been right smart excitement during the evening, but not during the night; there was no quarreling during the evening that I knew of; I do not know that I was excited when I went to the fire; when a pistol is fired it will excite most any man who has any feeling about him; I think Mr. William Tucker and Thomas Tucker were there; the marshal had been in there; I don't know if he was there at the time of shooting; my brother was behind the bar at the time; I never heard defendant speak a word; don't think he spoke at all; I don't think any other person tried to suppress the difficulty; if he did, I did not hear him; I requested them to have no difficulty in the house; I suppose deceased would weigh one hundred and forty pounds, may-be more; I guess Rufus Oneal would weigh one hundred and thirty-five or one hundred and forty pounds; deceased was about twenty-eight or thirty years of age—perhaps a little older or younger; I don't know his age; I do not know the age of these two young men; I think Rufus is a young boy, hardly grown, from his appearance."

J. T. MANN, sworn: "I knew deceased; I was present when he was killed; I know defendant when I see him; that is he (identifying prisoner;) I don't know how far apart they were at the firing; I was in the room at the time; I was sitting at the fire; deceased was standing on my right; he was talking to Rufus; Rufus had been talking some little time before the difficulty; I paid no attention to the difficulty; heard deceased say to Rufus, 'I am not mad, and don't get mad;' right after that he asked, 'what is in your hand?' immediately he stepped back in rear of me and said something, I do not know what it was; I rose and turned around; about the time I turned around deceased fell up against the door; I do not know whence the shot came; I did not see defendant

at the time; I did not know who did it; I did not see Rufus Oneal then ; deceased was standing with back to the fire; Rufus was in front of him (deceased), at the time deceased asked 'what is that in your hand;' I had seen defendant and Rufus on that night, but I had not noticed them; I don't know how long before; I don't know where defendant was at the time this was passed; deceased was not far from me; not more than three feet; I was sitting in the chair; he was standing; I heard deceased say 'I am not mad, and don't get mad;' in a very short time he (deceased) asked what is that he had in his hand; I examined deceased after he fell; I went to him and said: 'Joe, are you hurt much?' he did not answer, and I just raised up and turned and said: 'Boys, catch him; they have killed Joe Anthony;' some man remarked, 'I have got the man that done it, and his pistol; you go back to Joe;' when deceased spoke, he said it in common language; he did not speak angrily; I did not think he did; he spoke in ordinary tone of voice, and said, 'I am not mad, and don't get mad, myself;' if there was any words passed between them, I did not hear them; they broke and scuffled out; I don't know if they were trying to get away or not; I went right to deceased; my recollection is that it was after the train went; between nine and ten o'clock; deceased laid till fifteen minutes before or after three o'clock; had not spoke so I could understand him; I asked him if he knew me; I should say the shot killed him; I don't think the ball came out; it went on the right side of his temple; deceased had no stick or weapon that I saw; I think deceased had on his common, every day clothes; he had on an overcoat; I don't know if it was buttoned up or not. (Did deceased use any angry expressions during the conversation?) None at all, that I heard; all this occurred in Mr. McConnell's billiard room, in Clayton county, State of Georgia, December 24th, 1870, last year; I helped to take his over-coat off; I saw no weapon; I have known deceased since spring of 1858."

*Cross-examined:* I had been in the room, I suppose, about one and a half hours—I can't be positive; the shooting oc-

Oneal *vs.* The State of Georgia.

curred about half-past nine o'clock ; I do not remember all
that were there ; there were defendant and Rufus Oneal,
Billy Crane, and John McConnell ; I think Mr. Tucker was
in there ; there were several others ; I don't remember whether
one or two Tuckers ; I had taken one drink that night ; I
don't recollect how long before ; it was Christmas eve night ;
I noticed the parties being there ; I was sitting with my face
to the fire ; deceased was to my right ; I did not see John
McConnell right then ; I could not tell where he was ; de-
ceased was standing up ; I was sitting on the left hand side
as you go in ; deceased was at my right ; he was nearer the
right hand side of the fire-place than I was ; Rufus was in
front of deceased, between him and end of billiard table ;
Joseph was rather on my right ; Rufus was in rear of him ;
I can't tell how far he was from deceased ; he was not far ;
my attention was not attracted by any one else ; when I first
thought anything was wrong, I heard deceased say he was
not mad ; I was noticing him ; it struck me there was some-
thing wrong ; I heard Rufus make no reply, and I did not
see the firing of the pistol ; I did not see the parties clinched ;
I did not see deceased put his hand on Rufus' shoulder at all.
(Did you see defendant ?) I don't have any recollection of
seeing him at the time I discovered something was wrong ;
there were parties passing around the table when deceased
said I am not mad ; I don't know where defendant was ;
where deceased fell is not more than ten feet from where I
was sitting ; he fell to the right of door, not more than ten or
or twelve feet ; he fell on his back with his head right toward
railroad ; that was where he was lying when I got to him ; I
did not see John McConnell right at the time of the firing ;
I saw him before and after that ; I did not hear the reply
when he asked 'What was in his hand ?' Deceased said
something I did not understand, and did not speak angrily, as
he stepped back, when deceased asked what he had in his hand ?
I saw nothing in his hand ; they were on my right at the time
they backed out from me ; I saw defendant in the room before
it occurred ; I was not there during all the evening ; I suppose

it was eight or after when I went there   I was sworn in the commitment trial in this case; there was no one playing on the billiard table at that time; some of them had been playing keno; I do not know who all was in it; I saw deceased; I saw both Oneals; I played a game or two with them; there was no difficulty that I heard or saw."

JOHN A. MCCONNELL, sworn: "I am a regular practicing physician; I was called on to see J. M. Anthony on the 24th of December last; I found him in a prostrate condition from a gunshot wound in the right temple; it was the right temple, ball penetrating base of brain, ranging inward, downward and forward to some extent; I probed the wound and it was about four or five inches deep; it passed through the superorbital plate and right orbit, severing the right optic nerve. (What was size of the ball?) I suppose, from the orifice, it was a good sized pistol ball; I could introduce the small finger in it (the orifice;) the ball had passed in the direction of the throat, through into the throat; I can't tell how far further; I saw no place where it came out at; that wound could have been given by a pistol ball; that wound killed him; I am satisfied it caused his death. I knew Mr. Anthony; I had known him for a number of years; he was a healthy man; I suppose between twenty-eight and thirty years of age; I knew nothing of the circumstances of the killing; deceased died somewhere about three o'clock in the morning, five or six hours after the shooting; he died in this county from the effects of that wound; I heard the pistol shot; I suppose I was not over one hundred feet off; I saw no parties attempting to escape; I was just in the act of stepping out of the door; I had been in to get some Christmas tricks; I had stepped out just as the pistol fired."

Cross-examined: "The ball entered the temple; it ranged inward, downward, and somewhat forward; entered back part of temple; the position of the man shooting must have been rather to his side; I should think the ball entered the right temple; the ball may have been turned by the bone, and

changed its direction, throwing it downward; the range of the ball was inclined a little downward."

WILLIAM C. TUCKER, sworn: "I know deceased; I am not acquainted with the Oneals; I know when I see them, Rufus and defendant; I was in McConnell & Elliott's the night of the difficulty about half an hour; I don't recollect exactly; I saw the difficulty; the first I saw we were all standing before the fire; it was cold; we were all crowding around the fire; deceased was next to the fire; Oneal was next to him, pushing; crowd was pushing; pushed deceased against Oneal; that was Rufus Oneal; he said 'mind how you push;' deceased said he did not mean any harm; they took hold of each other then, and about that time Mr. McConnell (John McConnell) says, boys, don't have no fuss; deceased said he did not mean any harm by it; Mr. McConnell said don't have any fuss here; I forget what deceased said; he said he was not mad; I think that was said when McConnell said don't have no fuss; defendant rose up, and I forget what deceased said; he was not mad; defendant rose up at the time; deceased said ' don't you draw your knife on me' (to Rufus;) that was not more than a minute before the firing; I saw defendant when he shot at him; defendant was sitting on the box; that is the man (identifying prisoner;) I saw Oneal catch deceased by the shoulder before the shooting; Rufus caught deceased by the collar; he pushed him over in the corner; that is the way he happened to get away from the place where he was standing; the pistol was fired in a second after that; deceased had no stick in his hand; he had no weapon in his hand to strike with; I saw defendant get up off the box and walk about seven feet; he had his pistol out when he rose up from his seat; he had on a shawl or blanket; I never saw anything until he jumped off his seat and shot quick; he shot as if he was prepared to fire; he jumped right up and fired; he never said a word; just shot him; I don't think he spoke a word before he shot; deceased fell as soon as he shot; defendant ran from the back room to the bar-room; Joseph McConnell caught him; he carried his pistol with

him; some one caught Rufus; I did not go out of back room; he made no effort to draw or use a weapon of any kind; this occurred in McConnell's grocery, 24th December last, in this county; I was not drunk; I knew what I was doing; I did not drink."

*Cross-examined:* "I had not taken any drink then nor since; I was in the room I suppose one-half an hour; Mr. Oneal was nearest to me, I think he was between me and deceased. Deceased and Rufus were right in front of me and the fire; John McConnell was standing next to the fire, I think leaning against the mantel-piece; I don't remember where Mr. Mann was; Rufus finally pressed deceased out from the fire; I could not tell what deceased's position was exactly; it was done so quick I could not tell; I can't say that deceased put his hand on Oneal; I can't say say that I did see him; I saw it all; I saw nothing in Rufus' hand at the time; I heard all the conversation that passed after I came in; I heard deceased say he was not mad; Rufus said to deceased, 'don't run over me;' I suppose Rufus pushed deceased perhaps ten feet against the desk; deceased was next the fire; Rufus was behind him, and Mr. Oneal pushed deceased over in the corner; I don't recollect that I said (on preliminary examination) that the deceased unbuttoned his coat; I did not see him put his hand behind him; deceased fell on his back with his head toward the door, pretty much across the door; I think defendant was in that room when I went in; he was sitting there before the difficulty occurred; I was not in at the time of any game; I heard no mention of it; the Oneals never took a drop of drink while I was in; I never noticed if they were drunk or not."

J. O. Hightower, sworn: "I was marshal of this town in December last, at the time of this difficulty; I know the Oneals; there were two Oneals; I know Mr. Crane; I do not know what relation he is; I saw them in town together—they were in company pretty much all the evening; I was in the the room when the shooting took place; I walked into the room; I heard talking back in the room; I went to see if there was any difficulty; I was not anticipating a difficulty; I saw

Oneal *vs.* The State of Georgia.

the parties were drinking; defendant and his brother and Mr. Crane were all concerned in the little fracas that evening. It was a very cold night; I walked down to the fire and warmed myself; I saw nothing unusual—more than is usual in a grocery, especially when a crowd is there; I started out of the room and I met Mr. Mansfield, right at the end of the billiard table; the billiard table in the room where the shooting was; I was a little over the length of the table when deceased was shot; I was talking to Mr. Mansfield, with my back toward the fire, my face toward the door; Mr Joseph Hughie was attending to the bar; I heard him remark, 'boys, stop that,' or, 'none of that;' I just looked round and as I looked defendant rose and shot deceased; I heard some talking but nothing like a fuss; as Hughie made the remark, I looked round, and as I looked I saw defendant shoot him; deceased just fell back; I paid no more attention to deceased; Rufus Oneal ran by me; I looked after him, and caught him at the front door; he got out of the partition door—there are two partitions—he got through them both; I got him at the front door; grocery in front room; bar in second, and billiard room back; I was little over the length of the billiard table when the shooting took place—ten or twelve feet off; I did not see any weapon in deceased's hands; I never heard him speak a word; I don't think defendant spoke, if he did he spoke very low; there were several talking; but nothing creating excitement; Rufus was running as hard as he could; I caught him by the coat, he never stopped till I was in the act of knocking him down; he jerked on a few feet; I caught him, it was four or five feet before I could stop him; I first told him I would shoot him; I grabbed my stick to hit him, when we met Tom Mann, I believe it was, just at the door; I told him to take charge of him; Joe. McConnell caught the other one; I ran back; Mr. Joe. McConnell had him around the waist and had his pistol grabbed in his hand; Rufus Oneal struggled at first to get away, till he found he could not get away; I know that they got out of jail; I did

not see them get out; I was there in a very few minutes after they got out."

*Cross-examined:* " There were several in the back room; the two back doors were closed; my face was toward the front door; I was by the fire place; three or four on the other side; defendant was sitting on a box, to the right of the fire place; I suppose they felt their drinks; there was no likelihood of a difficulty; as I got to the corner of the (counter) billiard table, with Mansfield, Josh Hughie remarked, 'stop that,' or, 'none of that;' as he said that, I walked to see what was wrong, to see that there was no difficulty; as I walked to look, they were both close together, whether touching or not, I do not know; as I turned to look, defendant was in a rising position; he just stepped, leaned over and shot—all in a very few seconds. Deceased and defendant were about the same distance from me; neither of them were between me and the fire place; they were in a sort of corner; I did not see them touching each other; they were close together; I did not hear a word spoken by them, that I know; I was ten or fifteen feet off. I do not know that the parties were drinking."

J. A. McCONNELL, sworn: "I knew deceased; I knew him thirty years, I reckon; I know defendant when I see him; I never knew him until the night of the difficulty with deceased; never recollect seeing them in town before; I saw the Oneals together that night; William Crane was with them; I don't recollect seeing them before that night. I saw the shooting; there was a crowd in my house; there are two partitions; the house is sixty feet; the first room is fifteen feet; the next room is fifteen feet from first partition; last room is about twenty-eight feet of the fire place; I was standing with my face fronting second partition; I was selling some eggs; the door was open between the last partition and the third room. When the difficulty occurred, my attention was called in the direction of the fire place by the remark Hughie made, (the clerk in my house;) he said, 'boys, stop that;' I turned in that direction and saw deceased and Rufus Oneal clinched, and at the same time, or in a moment after, I saw

Oneal *vs.* The State of Georgia.

defendant rise and fire his pistol; I think he had a shawl on; there were several by the fire then; several between me and him; he rose right up and fired; there was a banister; I had a little stove; when I saw him shoot, I jumped the banister and caught him round and grabbed the pistol; he tried to get away from me; I thought he used every effort to get away from me; I told him I had him, and he should not move; I think we got down in the scuffle; he was trying to get away; he made no effort to use his pistol; I weighed about one hundred and eighty pounds; I was in good health; we were not scuffling more than three or four feet; as soon as I got him, I held him; that is the man, (prisoner.")

Mrs. M. Whaley, sworn: "I knew deceased; I know defendant—both the Oneals; I know William Crane; I remember the night Anthony was killed; I saw all these young men in my house; it was between ten and eleven o'clock in the forenoon; I saw defendant; I don't think he said anything. I had no bullet moulds Defendant fixed his pistol; he loaded it; he took his pistol to pieces, then rubbed and cleaned it and loaded it; he fixed the bullets with a hammer and knife; that was between ten and eleven o'clock of the day on which the man was killed; nothing was said between us; it was a large pistol; I should not know it if I saw it."

W. L. Waterson, sworn: "I knew deceased; I know the Oneals now; I know William Crane; I and deceased were together on Christmas eve; deceased is said to have been killed that night; we had been together all the evening; we might have been together in the fore part of the day; I was with deceased that evening—pretty well all the evening; I saw the two Mr. Oneals and Billy Crane together; it was Christmas eve; I was galanting around considerably; I noticed that most every place we went to, they came afterwards; I can't say how many times it occurred; Tom Oneal was with William Crane and Rufus Oneal, his brother; all of them together every time; I would say three or four times; I spoke to deceased and to Jesse Anthony about it; deceased had had no words with them that I know of; I remember Billy Crane

and Joseph Anthony having something to do one night. (Ob-·jected to.) I was in Tom's grocery and told deceased about these parties following us; I don't remember how deceased was dressed; I could not say if he had an overcoat."

*Cross-examined :* "I was taking a little drink that evening, occasionally; that was Christmas eve, in the evening of that day; deceased was drinking a little, I think; I don't remember how many drinks; he took his dram, I think; I don't know if he felt it; I don't know how many he took; I know we both had taken some; we were sitting by the stove; it was a very cold day; we generally sat by the fire. The Oneal boys, I think, were taking their dram; I don't remember their appearance, exactly; I was not personally acquainted with them; I could not say how their appearance was; I can't say that I remember seeing them take liquor; they were knocking about; can't say they were drunk or drinking; I considered them strangers in this county; I don't think I had seen defendant before; I had seen Rufus once; he was a stranger to me; I had no acquaintance with them; I think they were strangers. Deceased was a citizen, and resided here. We had no controversy with the Oneals; I don't think I did with Billy Crane; I had no feeling against them; I don't know they tried to run them out of town, as I first stated; I noticed them following us at Anthony's grocery; I first noticed then, that they had been following us; when we stepped in, they followed us, and when we went to another house, they would step in again; I noticed them in Anthony's first; I might have spoken something about it; we went, then, to Tom's; then we came back to Anthony's; then we went to McConnell's and Elliott's; John Smith had some torpedoes; we bursted them, then we came back; we bursted more and threw them in the crowd, bursting generally; I don't think we threw them on any body; we threw them against the wall; I think the boys were in the room at the time they were thrown; I am satisfied that none were thrown at their feet; I never saw deceased throw any torpedoes; I saw nothing disrespectful on the part of deceased; I do not remember seeing deceased at the time the torpedoes

were thrown; they were thrown in McConnell's; there was feeling between me and Crane, but I did not know the Oneals at that time; I had not been acquainted with them before; it was in the day time (in the evening) when we were going around on the 24th."

The State having closed, the defendant's counsel announced that they would introduce no testimony. The argument of counsel having been concluded, the Court charged the jury as follows:

"Murder is the unlawful killing of a human being, in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied. Express malice is that deliberate intention, to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied, where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

"To constitute the crime of murder, there must be an unlawful killing and it must be done with malice aforethought. A certain state of the mind constitutes malice. It is an intention to kill under such circumstances as would not justify, or in any way excuse the act of the killing should it occur, in pursuance of the intention. Whenever a killing by unauthorized violence is shown, the law presumes that it was done with malice aforethought, and denominates it as murder, unless the accompanying proof shows that it was done without malice. If the unauthorized killing be shown, and the accompanying proof does not show that it was done without malice, it then devolves upon the accused to show that it was done without malice. If a deadly weapon is used to accomplish the killing, which, in the manner it was used, is likely to produce death, the law presumes that such a result was intended. This presumption may be removed by proof. Express malice is that deliberate intention, unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof, such as lying in wait, threats, previous grudge, preparation for committing the act, etc. If express malice is

not shown, the law implies it; when no considerable provocation appears and when all the circumstances of the killing show an abandoned and malignant heart, the deliberate intention to kill must exist. If it does not exist at the time of the killing, the offense is not murder. It is not necessary that this deliberate intention should exist for any particular length of time, prior to the killing. If it existed at that time it is sufficient." The Court then read to the jury sections 4258 and 4259 of Irwin's Revised Code of Georgia, in reference to manslaughter and voluntary manslaughter, and said to reduce the offense from murder to manslaughter, it must be 'done without malice, either expressed or implied and without any mixture of deliberation whatever.

"The killing must be the result of that sudden violent impulse of passion, supposed to be irresistible. There must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killed, or other equivalent circumstances to justify the excitement and exclude all idea of deliberation or malice. If it should appear to you from the testimony in this case that Rufus Oneal was the brother of the defendant, and that Anthony, the deceased, made an assault upon the person of Rufus, and the defendant shot Anthony without deliberation or malice, but under that sudden violent impulse of passion supposed to be irresistible, he would not be guilty of murder—it would be manslaughter. If it should appear from the testimony that a misunderstanding occurred between Rufus Oneal and Anthony, and Anthony put his hand upon the person of Rufus, not in anger or for the purpose of injuring him, and defendant was present during the entire time and knew all that occurred, such action or conduct on the part of Anthony would not be sufficient in law to justify the excitement of passion and reduce the offense from murder to manslaughter. But if under such circumstances defendant, by the employment of means appropriated to that end, killed Anthony, the law would presume that he intended that result. You will not lose sight of the great controlling distinction between these

offenses. If the defendant deliberately shot and killed Anthony, with malice aforethought, it is murder. If he shot and killed him without malice and without any mixture of deliberation whatever, it is not murder."

The Court read sections 4264 and 4265 of Irwin's Revised Code, in reference to justifiable homicide and fear, etc., and said : "If you find from the testimony that Rufus Oneal and defendant were brothers, and that Anthony manifestly intended or endeavored to commit a felony on the person of Rufus by violence or surprise, and because of that, defendant shot and killed Anthony, he would not be guilty of any crime—the homicide would be justifiable. A bare fear would not be sufficient—it must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge. An assault or assault and battery is not a felony. The defendant begins the trial with a presumption of innocence in his favor, and the presumption remains until it is removed by proof. The proof must show that he is guilty beyond a reasonable doubt. His guilt cannot be shown to an absolute certainty—that cannot be done by testimony in Court. But his guilt must be made plainly and manifestly to appear. You must have that degree of mental assurance before which a prudent man acts without hesitation in reference to matters of the highest concern to himself. This doubt must be a reasonable one growing out of the testimony or the want of testimony. If, after an honest, impartial examination of the testimony, the mind of the impartial juror is wavering, unsettled, unsatisfied, that is the doubt of the law, and he should acquit. If that doubt does not exist, it would be his duty to convict. If you believe him guilty beyond a reasonable doubt, of murder, say so by your verdict. If you do not so believe, pass to voluntary manslaughter and see whether he is guilty of that. If you should so find, you can express it in your verdict. If you find him not guilty of voluntary manslaughter, acquit him."

Upon the conclusion of said charge the jury retired, and

after deliberation, returned into Court with a verdict of guilty of murder.

Whereupon counsel for defendant moved for a new trial in said case, upon the following grounds, to-wit:

1st. Because at the regular September Term of said Court, in said year, said case was called, and upon legal showing continued. Said case was therefore not in order to be heard at this special session of said Court, but at the next regular term of the same.

2d. Because Willis Beavers, one of the jurors that tried said case was disqualified by reason of his relationship to the prosecutor and deceased in this, that he is an uncle by marriage to said parties, which facts were unknown to the defendant or his counsel until after the trial of said case, said juror being put on defendant after his challenges were exhausted.

3d. Because of the newly discovered evidence as set forth in the affidavit of Joseph P. Hughie, said affidavit being a part of this bill of exceptions, to the effect that he saw the deceased falling with his hands around the waist of Rufus Oneal, and saw him grab or strike said Oneal upon the top of the head, and saw the parties scuffle around, and when the deceased had Rufus Oneal backed against the desk, some one fired and deceased fell; said facts were not communicated to defendant until after the trial of said case, nor to his counsel until during the argument.

4th. Because the Court failed to charge the jury that if they believed from the evidence that Thomas Oneal, acting under the fears of a reasonable man, and not in the spirit of revenge, killed Anthony because he feared and believed at the time the fatal shot was fired, that Anthony was about to commit a serious bodily injury less than a felony upon the person of Rufus Oneal, then the offense is reduced below murder, and if then defendant is guilty of any crime, he is guilty of manslaughter, which point was made and insisted on by counsel for defendant in argument before the Court and jury.

5th. Because the verdict of the jury was contrary to the charge of the Court.

Oneal *vs.* The State of Georgia.

6th. Because the verdict of the jury was contrary to the evidence, against the weight of evidence and without evidence and law to support it.

The ground of newly discovered evidence was supported by the affidavits of the defendant, the witness and defendant's counsel. The affidavit of E. W. Beck Esq., stated that the facts newly discovered from Joseph P. Hughie, were not communicated to him until the Solicitor General had concluded his argument to the jury.

The motion for a new trial was overruled by the Court, and defendant excepted and assigns said ruling as error.

E. W. Beck; M. M. Tidwell; Doyal & Nunnally; R. S. Dorsey, for plaintiff in error.

1st. Newly discovered evidence was material and not cumulative: 42 Ga. R., 623; 27 *Ibid.*, 339; 37 *Ibid.*, 464; Code, sec. 3665; 10 Wend. R., 285. Want of diligence not fatal: 24 Ga. R., 31.

2d. The Court cannot withhold from the jury any of the grounds put in issue: 29 Ga. R., 594. Jury entitled to all the law of the case: 5 Ga. R., 445. Court should define the several grades of homicide: 12 Ga. R., 142.

3d. The charge was calculated to mislead: 30 Ga. R., 24; 19 *Ibid.*, 335; 17 *Ibid.*, 497.

John T. Glenn, Solicitor General; Peeples & Howell, for the State.

1st. The case stood for trial at the special session; otherwise no case could then be tried: Code, secs. 3475, 3178; 34 Ga. R., 271.

2d. Juror was qualified: 1 Bish. Crim. Pro., 765; 11 Hump. R., 232.

Montgomery, Judge.

1. The Code, section 3178, provides for the holding of special terms for the trial of those accused of crime. When a person is indicted, he is of course liable to be tried either at a general or special term. Suppose a case continued at any

given term, and before the next term the Legislature changes the sessions of the Court, will the case not be in order for trial at the changed session immediately succeeding the passage of the law making the change? If then the time of trial can be changed by a law passed after the continuance, *a fortiori* may it be changed in accordance with a law in existence at the time the continuance is granted. And this is conceding that a continuance at one term is necessarily a continuance until the next regular term. Is it not rather a continuance for the term at which the continuance is granted? Certainly a continuance in a criminal case is for no longer than until the next term provided by law for the trial of such cases. To hold otherwise would be to defeat one of the main objects the Legislature had in view at the time of the passage of the law providing for these special terms, which was to dispose of the rapidly accumulating criminal business of the Courts; for by section 3475 of the Code all cases not reached stand continued. If the position of counsel for plaintiff in error be correct, all cases called and continued stand over until the next regular term, and by the section last referred to those not reached stand over also until the next regular term. What business then would be left for the special term? There was no showing for a continuance other than that above discussed.

2. If the juror objected to in this case is disqualified, it must be by reason of a supposed relationship between himself and the deceased and the prosecutor. The juror married the widow of their uncle. There are but two kinds of relationship known to the law: relationship by consanguinity and relationship by affinity. It is not pretended that the relationship here insisted on is of the first class. The consanguineous relations of relatives by affinity are not related at all; thus, the sister of a man's wife is not related by affinty to that man's blood relatives. Relationship by affinity does not extend to the nearest relations of husband and wife, so as to create a mutual relation between them: Bouvier's Dictionary, "Affinity;" and so all the elementary writers. The relationship here insisted on is, if possible, a degree further removed. If

Oneal *vs.* The State of Georgia.

the brother of the uncle's wife would not have been disqualified by reason of relationship by affinity, it would seem to follow, *a fortiori* that the husband of his widow is not. We think the juror was competent.

3. The newly discovered evidence is that of J. P. Hughie, and is as follows: "He saw Joseph Anthony feeling with his hands around the waist of Rufus Oneal, and saw said Joseph Anthony strike or grab Rufus Oneal on the top of the head, and Rufus Oneal and Anthony then commenced scuffling around, and Anthony backed Rufus Oneal against the desk, and while Anthony had him so backed against the desk some one fired, and Anthony fell." This evidence does not show that Anthony manifestly intended to commit a felony on Rufus Oneal. All the evidence shows he had no weapon of any kind, not even a stick; nor that a serious injury was intended or might accrue to Rufus Oneal, if indeed the facts bring the case within section 4266 of the Code. Nor do we think the evidence shows that the case stands upon the same footing of reason and justice as those referred to. In short, the evidence, if admitted, ought not to have had any weight with the jury.

But this evidence was communicated to prisoner's counsel before he made his concluding argument, and he declined to introduce it, as he might even then have done. Doubtless he judged, and judged correctly, if our estimate of the weight of the evidence be correct, that it was not worth the sacrifice of the conclusion. Assuming, however, that the evidence would have had more weight with the jury than we think it ought to have had, there is a want of diligence shown in not obtaining it earlier. If the facts stated in the affidavit of Hughie be true, why did not the prisoner and his brother, Rufus Oneal, direct the attention of counsel to it when he was cross-examining Hughie before the committing Court? If the evidence is thought important as showing justification for the shooting, the prisoner must have known of the existence of the facts. It is upon the hypothesis that he saw the occurrences as detailed by Hughie, that they would justify him, if

at all. If he were ignorant of them, he could hardly rely on their existence as justification.

4th. We see nothing in the evidence that would justify the charge upon reasonable fears. A man who could have entertained any fears at all of serious bodily injury to Rufus Oneal, from the facts as developed by the evidence, must have been unreasonably timid. Had the prisoner approached Anthony from behind and clasped him around the arms, his action would have been quite as effectual in preventing injury of any kind to his brother, as the terrible alternative to which he resorted, especially with many bystanders to assist in the separation of the parties, if assistance were necessary.

5th. We think the verdict amply supported by the evidence, and in strict accord with the charge.

Judgment affirmed.